UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PYRAMID HOLDINGS, INC. and <br> INTERNATIONAL BROTHERHOOD <br> OF ELECTRICAL WORKERS <br> LOCAL 98, <br> <br> Plaintiffs, <br> <br> v. <br> <br> INVERNESS MEDICAL <br> INNOVATIONS, INC., et al., <br> <br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | Civil Action No. 08-10615-JLT |

MEMORANDUM

July 29, 2009

TAURO, J.

I.      Introduction

Lead Plaintiff International Brotherhood of Electrical Workers Local 98[1] brings this securities class action against Defendant Inverness Medical Innovations, Inc. ("Inverness")—a company that develops, manufactures, and markets medical diagnostic products, and provides health management services—and against individual Defendants Ron Zwanziger, David Teitel, Christopher J. Lindop, Carol R. Goldberg, Robert P. Khederian, John F. Levy, Jerry McAleer, David Scott, Peter Townsend, John A. Quelch, and Alfred M. Zeien, who were officers or directors at Inverness during the time at issue. Lead Plaintiff claims violations of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, alleging that Defendants disseminated inaccurate or misleading documents in connection with a secondary public offering. Presently at issue is

---

[1] International Brotherhood of Electrical Workers Local 98 was appointed Lead Plaintiff under § 27 of the Securities Act by the October 2, 2008 Order of this court.

Defendants' Motion to Dismiss.  For the following reasons, Defendants' Motion is ALLOWED.

II.     Background[2]

The following background facts are taken as stated in Lead Plaintiff's Amended Complaint, as well as publicly filed documents.[3]

Inverness is a developer, manufacturer, and marketer of medical diagnostic products, and provides health management services.  The company bills itself as "a global leader in rapid point-of-care diagnostics,"[4] and its products are sold in approximately ninety countries.  Inverness has expanded dramatically in recent years to broaden its spectrum of health-related diagnostic tests.  In 2005, Inverness acquired Binax, Inc. and BioStar.  In 2006, it acquired ACON Laboratories, Inc. and Instant Technologies, Inc.  In 2007, it acquired Biosite, Inc., Colestech Corp., and HemoSense, Inc.  Inverness also announced plans to acquire Matritech, Inc., Panbio Ltd., and Alere Medical, Inc.

On November 14, 2007, Inverness held a secondary public offering ("SPO") of its stock.  In anticipation of the SPO, Inverness filed a Registration Statement with the Securities and Exchange Commission, and later filed a Prospectus Supplement, which was incorporated into and formed part of the Registration Statement.  Inverness's SPO Documents tout the company's

---

[2]In evaluating a motion to dismiss, this court must take all well-pleaded facts in the light most favorable to the plaintiff, resolving all reasonable inferences in his favor.  Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008).  This court need not, however, credit "unsubstantiated conclusions, . . . subjective characterizations, . . . or problematic suppositions."  Id.

[3] See In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 19 (1st Cir. 2003) ("[M]atters of public record are fair game in adjudicating Rule 12(b)(6) motions, and a court's reference to such matters does not convert a motion to dismiss into a motion for summary judgment.").

[4]Am. Compl. ¶ 35.

experience and strategic acumen in the area of acquisitions. The Registration Statement includes a section entitled "Our Strategy," which provides, for example, "We plan to continue to pursue selective acquistions, particularly acquisitions that would increase the market penetration and breadth of our product offerings and expand our distribution capabilities. We have significant experience in evaluating and completing acquisitions of businesses, technologies and intellectual property and in integrating acquired businesses."[5] Elsewhere, the "Our Strategy" section states, "An important element of our strategy is to reduce costs through the use of efficient high quality manufacturing operations that can leverage the common technology platforms that underpin many of our mature products."[6] Another form incorporated into Inverness's SPO Documents states, "We determine what we are willing to pay for each acquisition partially based on our expectation that we can cost effectively integrate the products and services of the acquired companies into our existing services."[7]

Inverness's Prospectus also provides a "Risk Factors" section, in which the company warns, "We may not accomplish the integration of our acquisitions smoothly or successfully. . . . [A]ny difficulties encountered in combining operations could prevent us from realizing the full benefits anticipated to result from these acquisitions . . . . Additionally, the costs associated with the integration of our acquisitions can be substantial."[8]

---

[5] Id. ¶ 47.

[6] Id.

[7] Id. ¶ 48.

[8] Id. ¶ 88.

Through the SPO, Inverness sold twelve million shares of its common stock at $61.49 per share, raising over $737 million. Inverness's share price dropped significantly in the months following the SPO. For example, on January 28, 2008, Inverness announced plans to acquire Matria Healthcare, Inc. That day, Inverness's share price dropped from $52.23—already down over $9 from its SPO value—to $47.97, and then sank to $43.80 on January 30, 2008.

On February 20, 2008, Inverness announced its financial results for the fourth quarter of 2007. The company reported revenues of $288 million, which represented a net loss of $12.5 million, or $0.19 per share. Its Selling, General, and Administrative ("SG&A") Costs rose from $42 million in the fourth quarter of 2006 to $80 million in the fourth quarter of 2007. During the same period, the company's revenues increased from $157 million to $288 million. Inverness's fourth quarter 2007 results also revealed an operating margin of roughly 18%, up from the fourth quarter 2006 level of roughly 11%.

Following Inverness's fourth quarter 2007 financial report, Inverness's share price fell from $43.87 on February 19, 2008 to $36.83 on February 20, 2008. Analyst Jeffries & Company, Inc. attributed this drop to "investor concerns over higher than expected SG&A costs in the quarter," adding that Inverness's "inability to sequentially improve operating margins caused investors to question the company's ability to integrate acquisitions and realize operating synergies expediently."[9]

The price of Inverness stock fell further after subsequent events. On February 28, 2008, Inverness announced that it was closing its Unipath facility in Bedford, England. Inverness's share price fell from $32.07 to $29.53. On March 18, 2008, Inverness announced plans to close

---

[9] Id. ¶ 84.

n
n

two facilities in San Francisco and a manufacturing plant in Louisville, Colorado. Inverness's share price fell from $28.86 to $26.72.

Lead Plaintiff alleges that Inverness "was experiencing major problems integrating the numerous companies it had acquired"[10] at the time of the SPO, and that the nondisclosure of these major integration problems created artificial inflation in the price of Inverness stock at the time of the SPO. To support the claim that Inverness was experiencing major integration problems, Lead Plaintiff cites the accounts of twenty confidential witnesses ("CWs 1–20"), all of whom are former Inverness employees. Nine of these witnesses worked for BioStar, and then for Inverness following BioStar's acquisition.[11] Five worked for ACON, and then for Inverness following ACON's acquisition.[12] Three worked for Cholestech, and then for Inverness following Cholestech's acquisition.[13] One worked for Biosite, then for Inverness following Biosite's acquisition.[14] One worked at Inverness's Innovacon subsidiary for approximately eight months.[15] Finally, one worked at Inverness as a regulatory affairs specialist for roughly three and a half years.[16]

---

[10] Id. ¶ 49.

[11] CW3, id. ¶ 54 n.3; CW5, id. ¶ 57 n.5; CW6, id. n.6; CW7, id. n.7; CW8, id. n.8; CW9, id. ¶ 58 n.9; CW10, id. ¶ 60 n.10; CW11, id. ¶ 63 n.11; and CW12, id. ¶ 66 n.12.

[12] CW1, id. ¶ 52 n.1; CW14, id. ¶ 69 n.14; CW15, id. ¶ 71 n.15; CW16, id. ¶ 72 n.16; and CW17, id. ¶ 73 n.17.

[13] CW2, id. ¶ 53 n.2; CW19, id. ¶ 76 n.19; and CW20, id. ¶ 77 n.20.

[14] CW18, id. ¶ 74 n.18.

[15] CW13, id. ¶ 68 n.13.

[16] CW4, id. ¶ 55 n.4.

CW1, a former Lead International Buyer for Inverness, states that Inverness "destroys every company it touches."[17] CW6, a former BioStar sales representative, states that John Yonkin, President of U.S. Point of Care and President of Inverness Medical Nutritional, told Inverness's sales force that Inverness is "wonderful at buying companies, but not great in integrating them."[18] CW14 states that "billing errors forced [Inverness] to write off collections it was otherwise due."[19] CW2 states that integration projects ran "significantly behind schedule."[20] CW11 states that Inverness's "strep test kits were giving 'false negative' results, rendering the tests invalid or unreliable."[21] CW9 adds an account of a customer complaint in which Inverness's Acceava pregnancy test kits allegedly yielded "results that were so bizarre that a doctor asked a male nurse to take a test using [the] kit, and the male nurse, according to the test results, 'came out pregnant.'"[22] "CW16 explained that there was a noticeable increase—at least by 65%—in customer complaints after ACON was acquired by [Inverness]."[23] Other confidential witness statements refer to "lack of communication,"[24] "large-scale layoffs" which

---

[17] Id. ¶ 52.

[18] Id. ¶ 57.

[19] Id. ¶ 70.

[20] Id. ¶ 53.

[21] Id. ¶ 64.

[22] Id. ¶ 65.

[23] Id. ¶ 73.

[24] Id. ¶ 54.

"negatively affected productivity,"[25] "major problems with product quality,"[26] and "costly failures, delays, and problems."[27]

III.  Discussion

    A.  Legal Standard

Dismissal pursuant to Rule 12(b)(6) is appropriate "if, and only if, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of [the plaintiff], the complaint 'fails to state a claim upon which relief can be granted.'"[28] In evaluating Lead Plaintiff's claim of major integration problems, this Court "accept[s] all well-pleaded facts as true and draw[s] all reasonable inferences in favor of [the plaintiff]."[29] Although this standard is deferential, it does not oblige the court "to swallow the plaintiff's invective hook, line, and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited."[30] The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."[31] Claims must cross "the line from the conceivable to the plausible" to survive a motion to dismiss.[32]

---

[25] Id. ¶ 55.

[26] Id. ¶ 64.

[27] Id. ¶ 68.

[28] Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009) (quoting Fed. R. Civ. P. 12(b)(6)).

[29] Id.

[30] Aulston v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

[31] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554 (2007).

[32] Id. at 570.

Sections 11 and 12(a)(2) of the Securities Act impose liability when a registration statement or prospectus contains an untrue statement of material fact or omits a material fact.[33] "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case."[34]  Section 15 of the Securities Act requires a primary violation of § 11 or 12(a)(2).[35]

B.     Puffery

The language in Inverness's SPO documents that Lead Plaintiff contends is materially untrue is a puffing sort that is "numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."[36]  Claims to "pursue selective acquisitions," or of an "expectation that we can cost effectively integrate" are the very sort of "rosy affirmation" that—"even if characterized as misstatement"[37]—are not actionable misrepresentations.[38]  Ultimately, it is the onus of "those

---

[33] See 15 U.S.C.A. §§ 77k(a), 77l(a)(2) (West 2009); In re WebSecure, Inc. Sec. Litig., 182 F.R.D. 364, 366–67. (D. Mass. 1998) (discussing provisions of §§ 11 and 12 (a)(2)).

[34] Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983) (discussing § 11 of the Securities Act).

[35] See Cooperman v. Individual, Inc., 171 F.3d 43, 52 (1st Cir. 1999).

[36] Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996).

[37] Id.

[38] See, e.g., Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp. 2d 12, 23 (D. Mass. 2000) ("Any statements made by the defendants relating to whether [the defendant] was 'well positioned' are ultimately no more than nonactionable 'puffing.'"); Van Ormer v. Aspen Tech., Inc., 145 F. Supp. 2d 101, 106–07 (D. Mass. 2000) (deeming such statements as "the purchase [of Chesapeake] will allow [Aspen] to enhance its software . . . and expand sales" to be "nothing

willing to brave the vicissitudes of the market and invest in publicly-held companies to disregard corporate braggadocio . . . ."[39]  Inverness's statements cannot support a misrepresentation claim.

      C.      <u>Risk Disclosure and Alleged Integration Problems</u>

Inverness's SPO Documents include a "Risk Factors" disclosure paragraph of roughly 100 words, which stipulates that the company "may not accomplish the intergration of our acquisitions smoothly or successfully."[40]  Investors therefore received a warning of potential integration problems.  Defendant's explicit disclosure of the precise risk upon which Lead Plaintiff rests its claim is ground for dismissal.[41]

Lead Plaintiff asserts that at the time of the SPO, Inverness was experiencing major problems integrating the companies it had acquired, and that its failure to disclose these integration problems violated §§ 11 and 12(a)(2) of the Securities Act.  A forward-looking

---

more than corporate puffery"). But see <u>Brumbaugh v. Wave Sys. Corp.</u>, 416 F. Supp. 2d 239, 250 n.11 (D. Mass. 2006) (noting that while the claim that "the puffing concept has all but gone the way of the dodo," 69A Am. Jur. 2d <u>Securities Regulation—Federal</u> § 1118 (2005) (citation omitted), "may be somewhat hyperbolic," dismissals on puffery grounds are nevertheless "inreasingly rare").

[39]<u>In re Tower Auto. Sec. Litig.</u>, 483 F. Supp. 2d 327, 337 (S.D.N.Y. 2007) (finding defendant's "nebulous and unmeasurable claims of 'success' in integrating its acquisitions" nonactionable).

[40]Am. Compl. ¶ 88.

[41]<u>See, e.g.</u>, <u>Tracinda Corp. v. DaimlerChrysler AG</u>, 364 F. Supp. 2d 362, 413–14 (D. Del. 2005) (finding that a Prospectus warning that "[t]here can be no assurance that this integration, and the synergies expected from that integration, will be achieved as rapidly or to the extent currently anticipated" had provided "sufficient information . . . to the investors in a reasonable format so as to enable investors to draw their own conclusions as to the risks of the transaction"); <u>Van Ormer</u>, 145 F. Supp. 2d at 106 (noting that defendant "specifically warned about the potential for integration problems under 'Risk Factors' in its Form 8-K SEC filing" in granting motion to dismiss).

warning, such as Inverness provided, could be regarded as misrepresentation if it warns only against future risks and implies that such risks are not immediately foreseeable and considerably certain. That is, a prospective risk disclosure "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."[42] The principle is, however, inapposite in this case, since Lead Plaintiff has failed to identify the imminent chasm about which shareholders were materially misled.

Lead Plaintiff grounds its claim of major integration problems in three sources: (1) the "skyrocketing" fourth quarter 2007 SG&A costs announced on February 20, 2008; (2) analyst Jeffries & Company, Inc.'s February 21, 2008 attribution of Inverness's 16% drop in stock price to "investor concerns over higher than expected SG&A costs in the quarter";[43] and (3) twenty confidential witness accounts of integration activities within Inverness. These sources do not support the existence of integration problems that would render the statements and warnings in Inverness's SPO Documents materially untrue, either by misrepresentation or by omission.

    1.    "Skyrocketing" SG&A Costs

Inverness's SG&A costs jumped from $42 million in the fourth quarter of 2006 to $80 million in the fourth quarter of 2007. As a percentage of revenue, the change in SG&A costs is far less extreme: from 27% of revenue in the fourth quarter of 2006 to 28% of revenue in the fourth quarter of 2007. The company completed twenty-one acquisitions that year.[44] The

---

[42] In re Prudential Sec. Ltd. P'shps. Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

[43] Am. Compl. ¶ 84.

[44] Defs.' Mem. Supp. Dismissal 7.

Complaint says nothing to preclude the plausible inference that the increase in SG&A costs and the increase in revenue are connected. Since acquisitions naturally lead to higher costs, but also offer a coincident increase in revenue, considering SG&A costs as a percentage of revenue is the sensible approach.[45] The success or failure of any venture is not measured solely by its costs, nor solely by its gains, but by the relationship between the two. As a percentage of revenues, Inverness experienced a 1% increase in SG&A costs from the fourth quarter of 2006 to the fourth quarter of 2007, which cannot be said to evince major integration problems.[46]

### 2. Jeffries & Company, Inc. Analysis

Investors' reaction to the fourth quarter report is insufficient to establish the existence of actual integration problems, let alone the nature and degree of those problems. Not every market reaction necessarily bespeaks a prior omission or misrepresentation. Jeffries & Company's attribution of share price decrease to "investor concerns over higher than expected SG&A costs in the quarter"[47] responds only to inverstors' attitude at the time that the fourth quarter report was issued—not to the condition of integration efforts at Inverness. Moreover, the market's reaction to Inverness's fourth quarter 2007 financial results took place after Inverness's stock had already

---

[45]Indeed, the Jefferies & Company securities analyst report cited by Lead Plaintiff in its Amended Complaint considered SG&A costs as a percentage of revenue. Defs.' Reply Mem. Supp. Dismissal 6.

[46]See Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (holding that an "alleged omission from the Prospectus of $12 million in owed distribution fees," which accounted for 0.4% of annual revenue, was "simply too small to be material as a matter of law when considered in the broader context of the company's revenues and expenses"); In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161 (D. Mass. 2000) (observing in a case involving a 2.6% overstatement of revenues that "[m]inor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law").

[47]Am. Compl. ¶ 84.

dropped considerably since the SPO. What was material to investors on February 20, 2008 provides no clear indication of what was or would have been material at the time of the SPO. The decline in share price cannot, without more, establish major integration problems.

### 3. Confidential Witness Statements

In evaluating Lead Plaintiff's confidential witness statements, the court considers "whether plaintiffs are justified by these subsidiary allegations in drawing the conclusion that the company was experiencing integration problems of such significance that they would have been important to a reasonable investor."[48]

Subjective generalizations are insufficient to justify allegations of integration problems.[49] In this case, for example, CW1's statement that Inverness "destroys every company it touches"[50] is too subjective to support Plaintiff's assertion that Inverness was experiencing major integration problems. CW6's contribution that John Yonkin told Inverness's sales force that Inverness is "wonderful at buying companies, but not great in integrating them"[51] is similarly unsupportive. Other confidential witness statements suffer from a similar failure to provide a meaningful degree of specificity. CW2's assertion that integration projects ran "significantly behind

---

[48] In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 24 (S.D.N.Y. 2004).

[49] See Fleming v. Lind-Waldock & Co., 922 F.2d 20, 23–24 (1st Cir. 1990) ("The pleadings are not sufficient where the plaintiff rests on 'subjective characterizations' or unsubstantiated conclusions.") (quoting Dewey v. Univ. of N.H., 694 F.2d 1, 3 (1st Cir.1982)).

[50] Am. Compl. ¶ 52.

[51] Id. ¶ 57.

schedule"[52] offers no indication what "significantly" means.[53] Complaints about "lack of communication,"[54] "large-scale layoffs" which "negatively affected productivity,"[55] "major problems with product quality,"[56] and "costly failures, delays, and problems,"[57] all fail to communicate with specificity the scope and the degree of integration problems within Inverness.

A number of confidential witness accounts do rise to a greater degree of specificity, but still lack contextualizing information. For example, CW14 explains that "billing errors forced [Inverness] to write off collections it was otherwise due."[58] The significance of this statement is unclear, since Lead Plaintiff fails to plead how many collections Inverness was forced to write off, what the value of those collections was, what percentage of the total value of collections it represented, what the total value of all collections was, relative to other business assets, and so on. In short, the statement provides no sense of whether these billing errors represent a major integration problem, or whether the errors might meaningfully contibute to a major integration problem.[59] As another example, CW11 relates that Inverness's "strep test kits were giving 'false

---

[52] Id. ¶ 53.

[53] See In re NTL, 347 F. Supp. 2d at 24 ("Claims of 'frequent' failures to complete service appointments, for example, are meaningless unless one knows what 'frequent' means.").

[54] Am. Compl. ¶ 54.

[55] Id. ¶ 55.

[56] Id. ¶ 64.

[57] Id. ¶ 68.

[58] Id. ¶ 70.

[59] See In re NTL, 347 F. Supp. 2d at 24 ("[T]he complaint contains no information that would permit determination of the significance of these . . . facts.").

negative' results, rendering the tests invalid or unreliable."[60]  CW9 adds an account of a customer complaint in which Inverness's Acceava pregnancy test kits allegedly yielded "results that were so bizarre that a doctor asked a male nurse to take a test using [the] kit, and the male nurse, according to the test results, 'came out pregnant.'"[61]  These stories are too anecdotal to support claims of major integration problems.

While some of the confidential witness statements do offer a modicum of quantitative information, that information is insufficient to draw any meaningful conclusions about integration problems.  For example, "CW16 explained that there was a noticeable increase—at least by 65%—in customer complaints after ACON was acquired by [Inverness]."[62]  Without further context, however—such as the frequency of customer complaints in relation to the number of products sold, and a typical frequency of customer complaints for similar products made by other companies—this quantitative information is hardly more expressive than the general and anecdotal information provided by other confidential witnesses.[63]  Quantitative information about the amount of time it took for various problems to be resolved[64] suffers from

---

[60] Am. Compl. ¶ 64.

[61] Id. ¶ 65.

[62] Id. ¶ 73.

[63] See In re NTL, 347 F. Supp. 2d at 24 (finding that although plaintiff provided survey data that indicated "an average on-hold time of 25 minutes and that over 35 percent of callers disconnected before reaching a customer service representative," because plaintiff failed to provide "any indication of what is normal in the operation of customer service call-in facilities," the information failed to support plaintiff's allegation of integration problems).

[64] For example, at least twenty-four hours to fix certain technology-related problems, Am. Compl. ¶ 71; two weeks to ship delayed customer orders, id. ¶ 59; more than three months to fix "a serious performance issue related to Strep A tests," id. ¶ 73; and approximately six to seven

the same defect. None of the information provided gives sufficient context for its true meaning or impact to be discernible.[65] Integrations are an inevitably complex process. Lead Plaintiff must provide more than "tales from the trenches" from a score of former Inverness employees.

The best and only gauge presently available to this court of what is normal in the course of Inverness's integration of acquired businesses is the behavior of SG&A costs. The fact that Inverness's SG&A costs, as a proportion of revenue, did not increase materially in response to the events described by Lead Plaintiff's confidential witnesses indicates that those events do not rise to the level of major integration problems. The change in SG&A costs "is simply too small to be material as a matter of law when considered in the broader context of the company's revenues."[66] Lead Plaintiff has thus failed to plead an actionable claim under §§ 11, 12, and 15 of the Securities Act.

---

months to "generate invoices and perform 'billing'" following the roll-out of a software program, id. ¶ 69.

[65]Cf. In re NTL, 347 F. Supp. 2d at 25 (finding only one employee statement adequate to support allegations of integration problems: an account of one of the individual defendants telling the company's managers "that the company had accumulated excessive debt and was having difficulty integrating the acquired companies." The defendant was quoted as having said that the company was "in trouble" and had "to cut back," and as having "instructed those present to keep the briefing confidential.").

[66]Garber v. Legg Mason, Inc., 537 F. Supp. 2d at 613.

IV. <u>Conclusion</u>

For the foregoing reasons, Defendants' Motion is ALLOWED. This case is DISMISSED. AN ORDER HAS ISSUED.

                                          /s/ Joseph L. Tauro
                                  United States District Judge